IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOHN DOMINO, MARGO DOMINO,
ROGER SPRINGMAN, LEONORE
NEUMANN, VERONICA NEUMANN-
THOMPSON, NICHOLAS THOMPSON
and YVONNE NEHRING,                                      OPINION and
                                                        ORDER
                            Plaintiffs,
                                                        09-cv-213-bbc
              v.

DIDION ETHANOL, LLC,

                            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

          Plaintiffs John Domino, Margo Domino, Roger Springman, Leonore Neumann,

Veronica Neumann-Thompson, Nicholas Thompson and Yvonne Nehring bring this action

for declaratory and injunctive relief and civil penalties under the citizen suit provision of the

Clean Water Act, 33 U.S.C. § 1365(a)(1).  Plaintiffs contend that defendant Didion

Ethanol, LLC, violated the Clean Water Act and permits issued under the Act.  Now before

the court is defendant's motion to amend its answer and plaintiffs' motion for partial

summary judgment.

          In this motion for partial summary judgment, plaintiffs are seeking only a declaration

1

that they have standing and a determination that defendant violated certain provisions of its wastewater discharge permit. As a procedural matter, defendant contends that the lawsuit is not ripe and that plaintiffs lack Article III standing to bring this lawsuit. Turning to the substance of plaintiffs' allegations, defendant denies both that it violated its wastewater discharge permit at any time and that any past violations were ongoing at the time plaintiffs filed suit.

I conclude that this suit is ripe for review with respect to all of plaintiffs' claims except those that are subject to a pending petition for review with the Wisconsin Department of Natural Resources. Also, I conclude that plaintiffs have Article III standing to bring this suit with respect to their claims that defendant violated the total suspended solids effluent limits, the water treatment additives limitations for CWT-530, RO-503, chlorine and sodium bisulfite and the prohibition on the discharge of floating solids in its wastewater discharge permit. However, genuine issues of fact exist that preclude summary judgment on the issue of Article III standing with respect to plaintiffs' claim that defendant violated the zinc effluent limits in its permit.

Finally, I conclude that defendant has violated the effluent limitations for total suspended solids, the dosage limitations for CWT-530, RO-503, chlorine and sodium bisulfite and the prohibition on the discharge of floating solids in its wastewater discharge permit, and in these respects has violated the Clean Water Act. Plaintiffs have shown that

2

these violations were ongoing at the time plaintiffs filed this law suit and may continue into the future.

From the findings of fact proposed by the parties, I find that the following are both material and undisputed.

## UNDISPUTED FACTS

### A. The Parties

1. Defendant Didion Ethanol, LLC

Defendant Didion Ethanol, LLC produces approximately 50 million gallons of fuel-grade ethanol distilled from corn each year.  It has an ethanol production facility in the Town of Courtland, Columbia County Wisconsin.  The Wisconsin Department of Natural Resources issued Wisconsin Pollution Discharge Elimination System permit number WI-0063771-01-0 to defendant, effective April 1, 2008.  The permit authorized defendant to discharge wastewater consisting of "cooling tower blowdown," "reverse osmosis reject water" and "filter backwash" from its facility in the Town of Courtland.  Defendant had no prior pollutant discharge permit.

2. Plaintiffs

Plaintiffs John and Margo Domino reside on the shores of Tarrant Lake in Cambria,

3

Wisconsin.  They moved to Cambria because of the wildlife and scenic beauty of the area and they enjoy fishing and viewing wildlife at Tarrant Lake.  John Domino has been the chair of the Tarrant Lake Preservation Committee and has invested time and money in the protection of the lake.  He and his wife have tried to restore wildlife to the lake by stocking fish and incubating the eggs of snapping turtles.  The wastewater discharge pipe from defendant's ethanol facilities is located about one mile upstream from the Domino's residence.  The Dominos have seen discolored water coming out of defendant's discharge pipe into tributaries of Duck Creek that flow into Tarrant Lake.  They are concerned that defendant's discharge of pollutants will harm the natural resources in and around the lake.  They have watched the lake's water quality decline in the past two years, and are disappointed that once common species are no longer visible at Tarrant Lake.  They no longer eat fish from the lake because of their concern about pollutants, and they worry about their own health and that of their pets.  Because they no longer enjoy the benefits of the lake, the Dominos are trying to sell their house, but are afraid their property values are lowered because of the pollutants discharged into the lake from defendant's ethanol plant.

Plaintiffs Leonore Neumann, Veronica Neumann-Thompson and Nicholas Thompson also reside in Cambria, Wisconsin, less than 1/4  mile from Tarrant Lake and ½ mile from defendant's ethanol plant.  Leonore Neumann is a scientist whose property is registered with the National Wildlife Federation as a "certified wildlife habitat."  Since defendant began

4

discharging pollutants into the waterway, she has observed a reduced number of birds, fish and turtles on her property.  Before defendant began discharging wastewater, Neumann, Neumann-Thompson and Thompson enjoyed hiking around the lake, but now there is less wildlife, poor water quality and unpleasant smells. They are worried that hiking by the lake is unsafe because of the pollutants.  Because they no longer enjoy the benefits of living near Tarrant Lake, they are attempting to sell their home.

Plaintiff Yvonne Nehring lives in Cambria, Wisconsin, approximately 1/4 mile from defendant's ethanol facilities.  Duck Creek flows in front of her home and she has a view of Tarrant Lake.  Before defendant began discharging wastewater, Nehring hiked and viewed wildlife at Tarrant Lake and Duck Creek.  When defendant began discharging wastewater, she stopped using the lake and creek for recreational purposes.  She has seen discolored water running past her home from defendant's discharge location and has seen an increased amount of pond scum and dead fish.

Plaintiff Roger Springman resides on the shore of Lake Wyona in Wyocena, Wisconsin, approximately 15 miles downstream from defendant's ethanol facilities.  He is an evironmentalist and outdoorsman and uses Lake Wyona and Lake Tarrant for hiking and fishing.

B.  <u>The Waterways</u>

5

Defendant's permit authorizes it to discharge wastewater from a six-inch pipe to an unnamed tributary of the north branch of Duck Creek.  The tributary originates upstream as a grassed waterway and flows from south to north along the east side of defendant's property.  The Wisconsin Department of Natural Resources determined that the tributary is navigable at approximately defendant's south lot line.  The tributary flows into the north branch of Duck Creek, which supports a warmwater forage fishery.  Duck Creek flows into Tarrant Lake, in the Village of Cambria, at a point approximately one mile downstream from defendant's wastewater discharge pipe.

C.  <u>Defendant's Permit and Discharge Monitoring Reports</u>

Defendant's Wisconsin Pollution Discharge Elimination System permit number WI-0063771-01-0 includes limitations on the rates and amounts of specified pollutants that may be discharged by defendant, limitations on water treatment additives and sampling and monitoring requirements.  The permit requires defendant to report the results of all monitoring to the Wisconsin Department of Natural Resources in "discharge monitoring reports."

1.  <u>Zinc discharge</u>

Section 1.2 of defendant's permit imposes monitoring requirements and effluent

6

limitations on several pollutants that defendant may discharge, including zinc and total suspended solids.

Zinc is a heavy metal that can be toxic to humans and aquatic life.  Section 1.2.1 of defendant's permit requires defendant to do the following:

- limit the total recoverable amount of zinc to a maximum weekly average of 340 micrograms a liter ($\mu$g/L), to be sampled on a monthly basis;

- limit the total recoverable amount of zinc to a daily maximum of 690 $\mu$g/L, to be sampled on a monthly basis;

- limit total recoverable amount of zinc to a weekly average of 0.57 pounds a day (lbs/day), to be sampled on a monthly basis; and

- limit the total recoverable amount of zinc to a daily maximum amount of 1.2 lbs/day, to be sampled on a monthly basis.

Defendant's discharge monitoring reports show that defendant's effluent measurements exceeded its permit limitations on the following occasions:

- the 340 $\mu$g/L weekly maximum allowance of zinc effluent on the weeks of July 15-21, 2008, August 8-14, 2008, September 8-14, 2008, November 8-14, 2008, December 1-7, 2008, the last week of December 2008 and January 1-7, 2009;

- the 690 $\mu$g/L daily maximum allowance of zinc effluent on November 11, 2008, December 2, 2008, December 30, 3008 and January 6, 2009;

- the maximum weekly average of 0.57lbs/day on December 1-7, 2008, the last week of December 2008 and January 1-7, 2009;

7

• the daily maximum of 1.2 lbs/day on December 30, 2008 and January 6, 2009.

Following the December 2, 2008 exceedance of its permitted zinc limit, defendant confirmed that the wastewater being discharged from the cooling towers contained elevated levels of zinc. In an effort to eliminate this noncompliance, defendant stopped discharging wastewater from its cooling towers on December 17, 2008, and drained and added fresh water to the cooling tower. Defendant told the Wisconsin Department of Natural Resources that it would resume its discharge of cooling water once the zinc level in the cooling tower was confirmed to be compliant with its permit limits. Defendant also told the Department that after it resumed discharge of cooling water, it would closely monitor the cooling tower water and make any adjustments necessary to keep the zinc levels within the effluent limits established in the permit. On or around December 26, 2008, defendant resumed the discharge of wastewater from the cooling tower. On December 30, 2008 and January 6, 2009, defendant exceeded its permitted zinc limit. As before, defendant confirmed that the cooling tower was the source of the violations, discontinued discharging wastewater from the cooling tower on January 15, 2009 and emptied, cleaned and refilled the cooling tower with fresh water.

Defendant told the department that it believed the zinc coated metal in the cooling tower had been corroding and was contributing to the elevated zinc discharge. In an effort to minimize corrosion, defendant adjusted the pH of the water contained in the cooling

8

tower and began monitoring the zinc corrosion rate in the cooling tower.  Cooling tower wastewater was not discharged during the month of February 2009.  In February, March and April 2009, defendant's zinc effluent levels were measured below permit limits.

2.  Total suspended solids discharge and monitoring

"Total suspended solids" is a measure of the degree of turbidity of a wastewater discharge.  Section 1.2.1 of defendant's permit requires defendant to limit its discharge of total suspended solids to a maximum of 10 milligrams a liter (mg/L) per day, to be sampled on a weekly basis.  Defendant's discharge monitoring reports show that its discharge of total suspended solids exceeded the permissible weekly average of 10 mg/L per day on the following days: September 5, 2008, September 23, 2008, October 7, 2008, January 6, 2009 January 27, 2009, May 14, 2009 and May 18, 2009.  Defendant did not sample or report total suspended solid effluent measurement between the period of May 22-28, 2008, November 1-7, 2008 or April 1-7, 2009.  The total suspended solids sample taken on November 28, 2008 was analyzed after the required holding time.

On February 17, 2008, Wisconsin Department of Natural Resources issued a notice of violation to defendant, alleging violations of the total suspended solids daily maximum discharge limit on September 5, 2008, September 23, 2008 and in January 2009.

9

3.  Whole effluent toxicity tests

Whole effluent toxicity tests measure the total toxicity of an effluent wastewater discharge on either a chronic or acute basis.  Sections 1.2.1 and 1.2.1.9 of defendant's permit require defendant to perform both chronic and acute whole effluent toxicity tests on a quarterly basis and report test results to the Department of Natural Resources on a discharge monitoring report form.  The tests measure the number of "toxic units" in the unnamed tributary of Duck Creek.  Any test resulting in a "relative toxic unit – chronic" ($rTU_c$) greater than 1.0 is considered a positive chronic whole effluent toxicity test.  Any test resulting in a "toxic unit – acute" ($TU_a$) greater than 1.0 is considered a positive acute whole effluent toxicity test.  If a test shows a positive result, defendant must submit the results of at least two retests to the Department of Natural Resources biomonitoring coordinator within 90 days of the positive test.

On September 23, 2008, defendant reported a positive chronic whole effluent toxicity test of 7.11 $rTU_c$. On October 21, 2008, defendant sent an email to Ken Denow at the Department of Natural Resources, requesting approval to delay the whole effluent toxicity testing it had scheduled originally for the last week of October.  Defendant told Denow that it wanted to pinpoint the source of toxicity in its wastewater discharge before proceeding with more whole effluent toxicity testing.  (Plaintiffs and defendant dispute whether defendant was asking the department for permission to delay only the round of whole

10

effluent toxicity testing scheduled for the following week or whether the request was to delay all future tests until the toxicity problem was found.)  On October 23, 2008, Denow emailed to defendant, stating that "the department concurs with your request to postpone the permit's required [whole effluent toxicity] testing . . . [W]e need you to provide a report of your findings as soon as this testing is done, including what they tested, what they learned, and what they intend to do next based on those results."  Denow stated also that once defendant "found and fixed [its] toxicity problem, all tests that were postponed will need to be completed."

Defendant did not perform or submit results of any chronic whole effluent toxicity retests following the September 23, 2008 positive test.  Defendant did not perform the acute or chronic whole effluent toxicity tests during the reporting periods of October 1, 2008 to December 31, 2008 or January 1, 2009 to March 31, 2009.

On April 6, 2009, Denow emailed defendant to say that "[t]here is no need for [whole effluent discharge] retesting if the discharge will no longer occur.  If you do not eliminate the discharge, you will need to conduct the retests at some point."  The email further stated that if defendant wished to request a postponement, it must do so in writing.

On April 14, 2009, defendant wrote to Denow, requesting permission to postpone whole effluent toxicity testing for 120 days while it investigated a wastewater reuse pilot program that might eliminate the discharge into the creek.  On April 28, 2009, Denow

11

responded by granting defendant permission to postpone whole effluent toxicity testing for 120 days until the pilot study was complete. (The parties dispute whether this postponement applied to all whole effluent toxicity testing, just the retests that were required after the September 2008 positive test or just the testing that was required for the second quarter of 2009.)  Defendant did not perform the acute or chronic whole effluent toxicity tests during the reporting period of April 1, 2009 to June 30, 2009.

4. <u>Section 1.2 and 1.2.1 monitoring and sampling requirements</u>

In addition to the monitoring requirements already discussed above, § 1.2 of defendant's permit requires it to monitor the pH, dissolved oxygen, $BOD_5$, copper, nickel and hardness levels of the wastewater discharge that enters the unnamed tributary of Duck Creek.

Defendant's permit requires it to sample pH weekly.  During the period from May 22, 2008 to May 28, 2008, defendant did not sample or report a pH result.

Defendant's permit requires it to sample dissolved oxygen weekly.  Defendant did not sample or report a dissolved oxygen effluent measurement during the period from May 22, 2008 to May 28, 2008.

Defendant's permit requires it to sample $BOD_5$ monthly.  Defendant's discharge monitoring report for May 2009 states that the $BOD_5$ sample taken on May 14, 2009 was

12

received and analyzed "past holding time."

5.  Water treatment additives

Defendant uses water treatment additives in its ethanol production facility.  Section 1.2.1.8 of its permit requires it to report the dosage rate of all additives used on a monthly basis.  Section 2.3.6 of the permit states that "[i]n the event that [defendant] wishes to commence use of a water treatment additive, or increase the usage of the additives greater than indicated in the permit application, the permittee must get a written approval from the Department prior to initiating such changes.  This written approval shall provide authority to utilize the additives at the specific rates until the permit can be either reissued or modified . . ."

In its permit application, defendant said that it would use the following additives, among others: chlorine, RO-503, CWT-530, sulfuric acid, Biotrol 120 and BWT-140.  The application also indicated the amount of each additive that defendant would use.

On September 12, 2008, defendant wrote to Ken Denow at the Wisconsin Department of Natural Resources, explaining that the additive dosage limitations it had included in its permit application to the department in December 2007 were too low and based on miscalculations.  Defendant requested adjustments to the usage limits for chlorine, RO-503, CWT-530, sulfuric acid and BWT-140 and advised the department that defendant

13

was using sodium bisulfite.  On September 17, 2008, James Schmidt of the Department of Natural Resources sent emailed defendant and Ken Denow, saying:  "Clearly, there is not going to be a concern with the two additives, CWT530 and RO503. . . it doesn't appear that there will be any water quality concern with those two components."  Schmidt did not address the sodium bisulfite usage or adjustments to sulfuric acid, chlorine or BWT-140 dosage limitations proposed in the September 12, 2008 letter.

Chlorine is a biocide.  In defendant's permit application, defendant stated that it would use 40 lbs/day of chlorine in its cooling tower, reverse osmosis and boiler systems.  In its September 12, 2008 letter to Ken Denow, defendant stated that it would use a maximum of 52.5 lbs/day of chlorine in the summer and 26.3 lbs/day in the winter.  In July 2008, August 2008, September 2008 and May 2009, defendant recorded a chlorine dosage rate higher than 40 lbs/day but less than 52.5 lb/day.

RO-503 is a clear yellow liquid with a pungent odor that may cause skin and eye irritation and gastrointestinal pain if ingested.  In its permit application, defendant stated that it would use 4 lbs/day of RO-503 in its cooling tower and/or boiler systems.  In its September 12, 2008 letter to Ken Denow, defendant stated that it would use a maximum of 8.1 lbs/day of RO-503 in the summer and 8.8 lbs/day in the winter.  During 2008 and 2009, defendant recorded the following rates of RO-503 dosage rates:  April 2008, 23.2 lbs/day; May 2008, 12 lbs/day; July 2008, 5.4 lbs/day; December 2008, 5.4 lbs/day; January

14

2009, 5.5 lbs/day; and April 2009, 8.24 lbs/day.

CWT-530 is a yellow liquid with an acrid odor that may cause eye and skin irritation and gastrointestinal pain if ingested.  In its permit application, defendant stated that it would use 17 lbs/day of CWT-530 in one or all of its cooling tower, reverse osmosis and boiler systems.  In its September 12, 2008 letter to Ken Denow, defendant stated that it would use a maximum dosage rate of 132.9 lbs/day in the summer and 77.2 lbs/day in the winter.  During 2008 and 2009, defendant recorded the following CWT-530 dosage rates: May 2008, 74.5 lbs/day; June 2008, 111.3 lbs/day; July 2008, 74.7 lbs/day; August 2008, 75.8 lbs/day; September 2008, 94.6 lbs/day; October 2008, 86.9 lbs/day; November 2008, 68.5 lbs/day; December 2008, 89.9 lbs/day; January 2009, 73.3 lbs/day; March 2009, 20.4 lbs/day; April 2009, 49.4 lbs/day; May 2009, 66.81 lbs/day.

Sulfuric acid is a heavy oily amber liquid with a sharp, penetrating odor that is harmful to aquatic life in very low concentration.  In its permit application, defendant stated that it would use 74 lbs/day of sulfuric acid in one or all of its cooling tower, reverse osmosis and boiler systems.  In its September 12, 2008 letter to Ken Denow, defendant stated that it would use a maximum dosage rate of 1230 lbs/day of sulfuric acid in the summer and 714 lbs/day in the winter.  During 2008 and 2009, defendant recorded the following sulfuric acid dosage rates: April 2008, 1102 lbs/day; May 2008, 1102 lbs/day; June 2008, 74.7 lbs/day; July 2008, 452 lbs/day; August 2008, 451 lbs/day; September 2008, 384 lbs/day; October

2008, 346 lbs/day; November 2008 319 lbs/day; December 2008, 1297 lbs/day; January 2009, 254 lbs/day; February 2009, 164.5 lbs/day; March 2009, 304.2 lbs/day; April 2009, 275.05 lbs/day; and May 2009, 235.12 lbs/day.

In its permit application and its September 12, 2008 letter to Ken Denow, defendant stated that the pH concentration range of sulfuric acid in the wastewater discharge would be between 8.0 and 8.5 pH.  Section 1.2.1 of defendant's permit states a pH range of 6.0 to 9.0.  On 42 days between April 9, 2008 and May 18, 2009, defendant's discharge was outside the 8.0 to 8.5 pH range.  There is no record that the pH level was ever measured outside the 6.0 to 9.0 range.

Defendant's permit application did not indicate that defendant would use the additive sodium bisulfite.  In its September 12, 2008 letter to Ken Denow, defendant stated that it would use a maximum dosage rate of 60 lbs/day of sodium bisulfite in the summer and 40 lbs/day in the winter.  In April 2009, defendant recorded a sodium bisulfite usage rate of 11.60 lbs/day.

6. Floating solids

Section 2.3.3 of defendant's permit provides that "[t]here shall be no discharge of floating solids or visible foam in other than trace amounts."  On September 12, 2008, an environmental consultant for plaintiffs, Barry Sulkin, was watching the pipe from which

16

defendant's wastewater discharge flows.  At approximately 11:18 a.m., Sulkin watched the volume of the discharge increase and turn from clear to murky yellow.  The murky yellow effluent contained a high concentration of solid material.  As the plume of discharge moved downstream, it discolored the water in the unnamed tributary and Duck Creek.  The yellow discharge continued to flow from defendant's pipe for 5 to 10 minutes, after which it subsided and became clear.  Later that day, at approximately 12:10 p.m., the volume of defendant's discharge increased again and became a murky yellow color with solid material, discoloring Duck Creek and its unnamed tributary.

On January 27, 2009, Sulkin returned to observe the discharge from defendant's pipe and saw yellow discharge with a high concentration of solids discharge from defendant's effluent pipe into the unnamed tributary of Duck Creek.

### D.  Defendant's Wastewater Reuse System

In early 2009, defendant solicited the help of three water treatment service companies to assist in the evaluation and design of a water treatment system that would not discharge wastewater into the unnamed tributary to Duck Creek.  Defendant decided to install a system that would recycle defendant's industrial wastewater in a contained system.  The wastewater reuse system required modification of defendant's current air permits, and defendant submitted a request for a "research and testing" exemption to its existing air

17

permits to the Department of Natural Resources on March 16, 2009. The department approved the request on April 22, 2009, allowing defendant six months to test the system and demonstrate that it would work properly. Defendant did not discharge any wastewater from June 1, 2009 to June 30, 2009. (It is disputed whether the wastewater reuse system completely eliminated wastewater discharge from the facility as of May 21, 2009.) Defendant has requested a permanent modification of its air permits from the Wisconsin Department of Natural Resources, which would incorporate the changes necessary to operate the wastewater reuse system on a long term basis. This request was pending approval in September 2009. Plaintiffs were aware in April 2009 of defendant's efforts to implement the wastewater reuse system.

### F. Procedural History

Defendant's wastewater discharge permit has an effective date of April 1, 2008. On May 27, 2008, plaintiffs John Domino, Margo Domino, Leonore Neumann and Roger Springman sought administrative review of defendant's wastewater permit. The Wisconsin Department of Natural Resources agreed to hold a contested case hearing on four issues: (1) under state law, is the monitoring and sampling frequency established in § 1.2.1 of the permit reasonable? (2) under state law, is the daily maximum chlorine limit reasonable? (3) under state law are the terms and conditions of the permit that control the additives sulfuric

18

acid, biotrol 120 and BWT 104 reasonable? and (4) under state law, is the phosphorus limitation in § 1.2.1 of the permit reasonable?

On February 4, 2009, plaintiffs wrote to defendant, notifying it that they intended to sue for violations of the Clean Air Act and defendant's wastewater discharge permit. Plaintiffs also sent a copy of the notice of their intent to sue to the administrator of the Environmental Protection Agency, the regional administrator of the Environmental Protection Agency, the secretary of the Wisconsin Department of Natural Resources, the Attorney General of the United States and the Attorney General for the State of Wisconsin.

On March 27, 2009, the Wisconsin Department of Natural Resources, defendant and the individuals challenging defendant's permit through the petitioner for review agreed to stay the administrative review proceeding, pending the outcome of the wastewater reuse project. The administrative law judge ordered the stay on April 1, 2009.

OPINION

A. Defendant's Motion to Amend Answer

In paragraph 60 of the complaint, dkt. #1, plaintiffs allege that:

Upon information and belief [Wisconsin Department of Natural Resources] has not provided written approval to Defendant authorizing it to commence use of additives or an increase in its usage of additives greater than indicated in Defendant's WPDES permit application.

19

In its answer, dkt. #7, defendant admitted the truth of paragraph 60.  Defendant has now filed a motion to amend its answer, dkt. #30, to deny the allegation in paragraph 60. Defendant alleges that since filling its answer, it has discovered email correspondence that qualifies as "written approval" for an increase in additive usage by the Department of Natural Resources.

The scheduling order in this case set August 14, 2009 as the deadline for amending pleadings.  It provided that "[a] party may not amend pleadings after the deadline without leave of the court, which will be granted only upon showing of good cause for the late amendment and lack of prejudice to the other parties."  Dkt. #9, at 1; Fed. R. Civ. P. 16(b)(4).  Rule 16(b)'s "good cause" standard focuses primarily on the diligence of the party seeking amendment.  Trustmark Insurance Co. v. General & Cologne Life Re of America, 424 F.3d 542, 553 (7th Cir. 2005).

Defendant contends that it has good cause to amend its answer because plaintiffs had not raised the issue of the Department of Natural Resource's approval of the usage of water treatment additives until they filed their motion for summary judgment on August 11, 2009. Defendant argues that because the deadline for dispositive motions is not until December 11, 2009, the parties had not yet begun discovery and because the additive issue did not arise until plaintiffs had filed their motion for summary judgment, defendant had no reason to conduct a searching inquiry into email correspondence between defendant and the

20

department relating to additives.

Defendant is wrong when it says that the issue regarding additives was not raised until plaintiffs had filed their motion for summary judgment. Defendant has been on notice of the issue since early February 2009, when plaintiffs sent it an intent-to-sue letter based on numerous alleged violations of defendant's permit. The letter included an allegation that defendant was violating the water treatment additives terms of its wastewater discharge permit by increasing additive usage without prior written approval. Plaintiffs alleged the same issue in their complaint filed on April 9, 2009. Defendant had 60 days to search records and emails before preparing a response to plaintiffs' complaint. Despite having four months' advance notice that the additives issue would be a main component of plaintiffs' case, when defendant filed its answer on June 9, 2009, it "erroneously admitted" paragraph 60 of the complaint because it "failed to recall receiving specific written approval" related to additives. Dft's. Mot. to Amend, dkt. #30, at 1. Further, after plaintiffs filed their motion for summary judgment on August 11, 2009, defendant still had three days within which it could have amended its answer without leave of the court and within the deadlines established in the scheduling order. Instead, defendant waited until the last day its response to plaintiffs' motion for summary judgment was due, September 1, 2009, to seek leave to amend its answer, without any explanation for its long delay. Under these circumstances, defendant has not established good cause.

21

Moreover, plaintiffs would be prejudiced significantly if defendant amends its answer at this stage. Defendant's admission relates to a critical element of plaintiffs' claims. With such an admission, plaintiffs did not think discovery on this point was necessary. Plaintiffs relied on defendant's admission as to paragraph 60 as a ground for filing their motion for partial summary judgment. It would not be fair to allow defendant to lull plaintiffs into believing this was not an issue in the case, only to pull the rug out from under them now.

Finally, even if defendant had shown good cause and lack of prejudice to plaintiffs, I would deny defendant's motion to amend its complaint on the grounds that defendant's proposed amendment would be futile. Utility Audit, Inc. v. Horace Mann Service Corp., 383 F.3d 683, 688 (7th Cir. 2004); see also Campania Management Co., Inc. v. Rooks, Pitts & Poust, 290 F.3d 843, 850 (7th Cir. 2002) ("A court may determine that a proposed amendment is futile if it sets forth facts or legal theories that are redundant, immaterial, or unresponsive to the allegations in the complaint"). Defendant's wastewater discharge permit requires defendant to obtain "written approval from the Department" before "commenc[ing] use of a water treatment additive, or increase the usage of the additives greater than indicated in the permit application." The permit indicates that such written approval will be in the form of an "authorization letter."

Defendant alleges that the September 17, 2008 email from James Schmidt to defendant qualifies as the department's written approval for defendant to increase the dosage

22

of water treatment additives used in its ethanol production.  In the email, Schmidt states that there is "not going to be a concern with the two additives, CWT530 and RO503 . . . it doesn't appear that there will be any water quality concern with those two components."

Defendant's characterization of this email is inaccurate.  The email is too equivocal to constitute  "written approval" from the department authorizing defendant to increase its usage of water treatment additives.  Although the email shows that defendant specifically requested the department's approval for alteration to the dosage of several additives, the department did not give approval, only an opinion that it did not "appear" that water quality would be a "concern" with respect to two of the additives.  The email does not even address all of defendant's proposed dosage adjustments; it ignores defendant's request to start using sodium bisulfite and alter the dosages of sulfuric acid, chlorine and BWT-140.  Because this email could not be construed as "written approval" from the department, defendant's request to amend its answer to include facts concerning this email exchange would not put into dispute plaintiffs' proposed finding that defendant altered its additive usage without proper written approval.

Defendant has not shown good cause for its late amendment, lack of prejudice to plaintiffs or a need to amend.  Therefore, its motion for leave to amend its answer will be denied.

23

B.  <u>Plaintiffs' Motion for Partial Summary Judgment</u>

1.  <u>Clean Water Act</u>

Congress enacted the Clean Water Act to restore and maintain the "chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The Act prohibits the "discharge of any pollutant by any person" without proper authorization, such as a permit.  33 U.S.C. § 1311(a); <u>Atlantic States Legal Foundation v. Stroh Die Casting Co.</u>, 116 F.3d 814, 818 (7th Cir. 1997).

The Act established the National Pollutant Discharge Elimination System program to regulate "point sources," that is, single identifiable places that discharge pollutants.  33 U.S.C. § 1362(14).  Under the program, the United States Environmental Protection Agency can issue discharge permits to point sources seeking to discharge pollutants into navigable waters of the United States.  33 U.S.C. §§ 1342, 1362(12).  The Environmental Protection Agency has authorized the Wisconsin Department of Natural Resources to administer the permit program for discharges into navigable waters within Wisconsin through the Wisconsin Pollutant Discharge Elimination System.  Wis. Stat. § 283.31.  The permits issued under the Wisconsin Pollutant Discharge Elimination System use effluent limitations to control discharges into navigable waters.  Wis. Stat. §§ 283.001(1), 283.31.

Under the Clean Water Act, each permittee must establish and maintain records, install and use monitoring equipment, sample its effluent according to a prescribed schedule

24

and report the results to the permitting agency. 33 U.S.C. § 1318(a); 40 C.F.R. §§ 122.41(j)(3), 122.48.  The effluent reports, which are submitted on standard forms, are known as discharge monitoring reports.  40 C.F.R. §§ 122.2.

The Clean Water Act is a strict liability statute.  Kelly v. Environmental Protection Agency, 203 F.3d 519, 522 (7th Cir. 2000).  All that is needed to establish a violation is proof that a point source polluter violated the terms and conditions of the Clean Water Act or a permit issued under the Act.  Stroh Die, 116 F.3d at 818.  Discharge monitoring reports showing that the permittee exceeded its permit limitations are conclusive evidence of a permit violation.  United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054, 1112 (W.D. Wis. 2001).

The holder of a pollutant discharge permit is subject to federal and state government enforcement for failure to comply with the conditions of the permit.  In the absence of federal or state enforcement, private citizens may enforce the Clean Water Act by filing a civil action, referred to as a "citizen suit," in federal court against any person who is alleged to be in violation of "an effluent standard or limitation."  33 U.S.C. § 1365(a)(1).  A violation of an "effluent standard or limitation" includes a violation of a discharge permit and discharge of any pollutant by any person without a valid permit. 33 U.S.C. §§ 1311(a), 1362(11); Wis. Stat. § 283.01(6).  Sixty days before initiating a citizen suit, the would-be plaintiff must give notice of the alleged violation to the EPA, the state in which the alleged

25

violation occurred and the alleged violator. 33 U.S.C. § 1365(b)(1)(A).  If the plaintiff prevails in a citizen suit, the court may order injunctive relief, civil penalties payable to the United States Treasury and legal costs and fees.

Plaintiffs are bringing this suit under § 1365(a), alleging that defendant has violated its Wisconsin Pollutant Discharge Elimination System permit and the Clean Water Act.  In this motion for partial summary judgment, plaintiffs seek to establish standing and defendant's liability for violating several conditions of its permit.  Plaintiffs contend that defendant has violated (1) the zinc effluent limits in § 1.2 of its permit; (2) the total suspended solids effluent limits in § 1.2 of its permit; (3) the whole effluent toxicity retest requirements in § 1.2.1.9 of its permit; (4) the sampling requirements for pH, dissolved oxygen, total suspended solids and whole effluent toxicity in § 1.2.1 of its permit; (5) the water treatment additives limits incorporated by § 2.3.6 of its permit; and (6) the prohibition on floating solids in § 2.3.3 of its permit.  (In plaintiffs' reply brief, they abandoned claims that defendant had violated the monitoring requirements for copper, nickel and hardness).

Defendant does not deny that plaintiffs have complied with the notice requirements of § 1365(b), by giving notice more than 60 days before filing this suit to the administrator of the Environmental Protection Agency, the state and defendant.  However, it contests the ripeness of the suit and plaintiffs' standing to sue.  Defendant also denies plaintiffs'

allegations that it has violated the Act or its wastewater discharge permit.

2.  Justiciability

Before addressing the merits of plaintiffs' claims, I must be satisfied that jurisdiction exists to decide this case.  State of Illinois v. City of Chicago, 137 F.3d 474, 478 (7th Cir. 1998) ("[A] court is not free to decide the merits when there is no justiciable controversy.  Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further.")  In this case, two issues affect justiciability: ripeness and Article III standing.

a.  Ripeness

_____The Constitution limits federal judicial power to actual cases or controversies.  U.S. Const. art. III, § 2; Friends of the Earth, Inc. v. Laidlaw Environmental Service, 528 U.S. 167, 178 (2000).  A case or controversy requires a claim that is ripe and a plaintiff who has standing.  Indiana Right to Life, Inc. v. Shepard, 507 F.3d 545, 549 (7th Cir. 2007).  "The two concepts require related but distinct inquiries: 'Whereas ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action.'"  Id. (emphasis in original) (quoting Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1298 n.1 (3d Cir. 1996)).

Defendant contends that plaintiffs' suit is not ripe in light of the pending

27

administrative review of defendant's wastewater discharge permit before the Wisconsin Department of Natural Resources.  The doctrine of ripeness "keeps federal courts in the business of resolving existing legal disputes and out of the business of offering advice on the legality of a proposed course of action."  Deveraux v. City of Chicago, 14 F.3d 328, 330 (7th Cir. 1994).  Ripeness is essentially a question of timing, and depends on whether the plaintiffs' threatened injury is sufficiently imminent to warrant judicial action.  Regional Rail Reorganization Act Cases, 419 U.S. 102, 143 (1974).  To establish ripeness, plaintiffs must demonstrate both (1) the fitness of the issues for judicial decision and (2) the "hardship to the parties of withholding court consideration."  Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967); Metropolitan Milwaukee Association of Commerce v. Milwaukee County, 325 F.3d 879, 882 (7th Cir. 2003).

The fitness for judicial decision inquiry guards against judicial review of hypothetical or speculative disputes.  Babbitt v. United Farm Workers National Union, 442 U.S. 289, 297 (1979).  Legal issues that require little further factual development are fit for review.  Wisconsin Central, Ltd. v. Shannon, 539 F.3d 751, 759-60 (7th Cir. 2008).  Defendant contends that plaintiffs' suit is not fit for judicial review because the legal predicate for plaintiffs' suit, namely, defendant's wastewater discharge permit, is not final and will not be final until administrative review is complete.  Defendant argues that because the ripeness doctrine is intended to "protect agencies from judicial interference until an administrative

28

decision has been formalized" and defendant's permit may be modified as a result of the administrative review, it would be prudent for the court to dismiss this suit.  Further, defendant argues that plaintiffs cannot assert permit violation claims against defendant because the terms of the permit are ineffective under Wisconsin law until the administrative review proceeding is complete.

The petition for review provision, Wis. Stat. § 283.63(1), provides that "5 or more persons may secure a review by the department of . . . the reasonableness of or necessity for any term or condition of any issued, reissued or modified permit, any proposed thermal effluent limitation established under s. 283.17 or any water quality based effluent limitation established under s. 283.13(5)."  Further, "[a]fter a verified petition for review is filed and until the last day for seeking review of the department's decision or a later date fixed by order of the reviewing court, *any term or condition, thermal effluent limitation or water quality based effluent limitation which is the subject of the petition is not effective*.  All other provisions of the permit continue in effect . . ."  Wis. Stat. § 283.63(1)(am) (emphasis added).

In this case, two of the issues that will be considered at a contested case hearing before the Wisconsin Department of Natural Resources are relevant to plaintiffs' claims:  (1) whether the monitoring and sampling frequency established in § 1.2.1 of the permit is reasonable under state law; and (2) whether the terms and conditions of the permit that control the additive sulfuric acid are reasonable under state law.  Because these two issues

29

are subject to a verified petition for review under § 283.63(1), the permit's terms and conditions related to these issues are not effective. Wis. Stat. § 283.63(1)(am). I agree with defendant that it is too early to decide plaintiffs' claims that defendant violated the monitoring and sampling requirements in § 1.2.1 or the additive limitation for sulfuric acid incorporated by § 2.3.6 of its permit. These claims are not ripe for review because the agency decision about these permit conditions has not yet been formalized.

However, I disagree with defendant that the pending administrative review proceeding makes all of plaintiffs' claims unfit for judicial review. Unlike the cases cited by defendant, this is not one in which plaintiffs are alleging injury as a result of an agency action. E.g., Sprint Spectrum L.P. v. City of Carmel, Indiana, 361 F.3d 998, 1004 (7th Cir. 2004) (challenge to zoning board decision not ripe for review because local government had not yet acted with finality). Plaintiffs' claims are based solely on defendant's permit violations and on the assumption that defendant's permit and the underlying agency action are valid and operative. If, as a result of the administrative hearing, the Department modifies the terms and conditions of defendant's permit, the modification would not affect defendant's liability for violations of other permit conditions that are in effect at this time. Plaintiffs' claims are based on allegations of concrete and ongoing injuries that are sufficiently imminent to warrant judicial action. Regional Rail Reorganization Act Cases, 419 U.S. at 143. Their suit does not involve "hypothetical, speculative or illusory disputes."

30

Hinrichs v. Whitburn, 975 F.2d 1329, 1333 (7th Cir. 1992).  Their allegations are drawn from defendant's own discharge monitoring reports, so the relevant legal issues require little, if any, further factual development.

The Court of Appeals for the Seventh Circuit has concluded that no prudential ground exists for barring a federal citizen suit based on violations of a permit from proceeding concurrently with an administrative challenge to portions of that same permit. E.g., Sierra Club v. Franklin Power of Illinois, 546 F.3d 918, 929 (7th Cir. 2008) (citizen-plaintiff does not have to wait until relevant agency decides whether a permit issued under Clean Air Act is valid, "at least when . . . a suit is not asking us to review an agency action"); see also Natural Resources Defense Council v. Outboard Marine Corp., 692 F. Supp. 801, 809, 811 (N.D. Ill. 1988) (holding that "any possibility that [the state agency] will modify the [permit] requirements *for the future* does not warrant abstention as to violations of the presently operative provisions" and that "the procedure designed by Congress requires this Court to enforce those [permit] restrictions").  Plaintiffs' claims that are not related to the monitoring and sampling requirements in § 1.2.1 or the additive limitation for sulfuric acid are fit for judicial review.

Plaintiffs would suffer considerable hardship if the court were to withhold consideration of the issues presented.  Hardship may be found when there may be a "substantial immediate impact" to the interests of plaintiffs as a result of the challenged

31

action.  Hinrichs, 975 F.2d at 1335-36.  Plaintiffs allege considerable injury to pecuniary, recreational and aesthetic interests as a result of defendant's alleged permit violations.  Although defendant contends that plaintiffs will no longer suffer injury because its new wastewater reuse system will prevent further wastewater discharge, this is not an appropriate consideration for the ripeness analysis.  The new wastewater system was not fully functional at the time plaintiffs filed suit, alleging that permit violations are likely to occur in the future.

Defendant's argument about its wastewater reuse system would be more appropriate in the context of a mootness analysis.  Federal courts can lose jurisdiction over citizen suits when a defendant can show that its voluntary conduct has made the case moot.  Laidlaw, 528 U.S. at 189; see also Walters v. Edgar, 163 F.3d 430, 432 (7th Cir. 1998) ("If a case becomes moot, the court loses jurisdiction, even though the case was not moot when filed.").  However, the burden is on the defendant to show that "subsequent events [make] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Laidlaw, 528 U.S. at 189; Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 66 (1987) ("longstanding principles of mootness . . . prevent the maintenance of suit when there is no reasonable expectation that the wrong will be repeated") (internal quotations emitted).  Because defendant has not raised a mootness challenge, I will not consider facts related to its wastewater reuse system at this time.

b.  Article III standing

Like ripeness, the doctrine of standing is an essential element of the "case or controversy" requirement found in Article III.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  The constitutional requirement of standing requires plaintiffs to prove three elements.  First, plaintiffs must prove that they have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent" rather than "conjectural or hypothetical."  <u>Laidlaw</u>, 528 U.S. at 180-81.  Second, plaintiffs must show causation in the form of a fairly traceable connection between the plaintiffs' injuries and the challenged conduct of defendant.  <u>Id.</u>  Third, plaintiffs must show that it is likely, and not just speculative, that their injury would be redressed by a favorable decision.  <u>Id.</u>  At the summary judgment stage, plaintiffs must set forth specific facts, that, if true, establish that plaintiffs meet the Constitution's standing requirements.  <u>Lujan</u>, 504 U.S. at 560-61.  If defendant wishes to argue that plaintiffs lack standing, defendant must demonstrate that plaintiffs' evidence is "sham and raise[] no genuine issue of fact."  <u>Gwaltney</u>, 484 U.S. at 66 (1987) (quoting <u>United States v. Students Challenging Regulatory Agency Procedures</u>, 412 U.S. 669, 689 (1973)).

The standard for granting summary judgment on standing is the same as for any other legal issue.  Summary judgment is appropriate if there are no genuine issues of material fact related to plaintiffs' standing and plaintiffs are entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56.   The court treats as credible the admissible evidence presented by the non-movant, defendant in this instance, and draws all reasonable inferences in defendant's favor.

1) injury

It is not disputed that plaintiffs suffered injury in fact in this case and that the injury is actual, concrete and sufficient for standing purposes.   Environmental plaintiffs satisfy the injury in fact requirement of standing when they prove  that they use the affected area and are persons "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity.  Sierra Club v. Morton, 405 U.S. 727, 735 (1972).  All plaintiffs live near Duck Creek and Tarrant Lake and use the area frequently for recreational activities, but have stopped engaging in activities in or near the lake because of their concern about the harmful effects the pollutants discharged by defendant into the water.

2) traceability

In Clean Water Act cases, plaintiffs must show that the discharged pollutants cause or contribute to the kinds of injuries alleged by the plaintiffs.  Texas Independent Producers & Royalty Owners Association v. EPA, 410 F.3d 964, 973-74 (7th Cir. 2005); Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn in Terminals, Inc., 913 F.2d 64, 72 (3d Cir. 1990).  Plaintiffs do not need to prove causation with scientific certainty.

34

Texas Independent Producers, 410 F.3d at 973-74.  If they point to facts showing that a particular pollution source is the cause of their injuries and the owner of the pollution source does not supply an alternative culprit, plaintiffs meet the causation requirement of standing. Id. at 974.

Plaintiffs' injuries relate to diminished use and enjoyment of Duck Creek and Tarrant Lake because of aesthetic, health and ecological concerns.  The pollutants that defendant discharged into the unnamed channel of Duck Creek can cause the types of harms alleged by plaintiffs.  For example, zinc, chlorine and sulfuric acid can be harmful to humans and aquatic life.  High levels of turbidity and solids can lessen the aesthetic value of a waterway. RO-503, CWT-530 and sulfuric acid have particularly strong smells, which can decrease recreational use and enjoyment of an area.  Defendant's failure to monitor whole effluent toxicity increases plaintiffs' anxiety about the health and safety of the area.  Defendant has not disputed this and or argued that the pollutants it discharged caused plaintiffs' injuries.


3) redressability

To satisfy redressability, the third prong of the standing test, plaintiffs must show "a likelihood that the requested relief will redress the alleged injury."  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 103 (1998).  Plaintiffs are requesting injunctive relief as well as imposition of civil penalties.  They want an order directing defendant to comply

35

with the requirements in its wastewater discharge permit and take specific measures to secure such compliance, so as to improve water quality, property values, recreation and fish and wildlife health.

The imposition of injunctive relief or civil penalties can afford redress to citizen plaintiffs in Clean Water Act cases only if the unlawful discharge is ongoing.  Id. at 108; Laidlaw, 528 U.S. at 186.  An injunction does not benefit plaintiffs if defendant has already stopped the unlawful activity at the time plaintiffs filed suit.  Steel Co., 523 U.S. at 108. Similarly, civil penalties that are payable to the United States Treasury benefit citizen plaintiffs only if the penalties encourage a defendant to abate current violations and prevent future ones.  Laidlaw, 528 U.S. at 186.  If defendant has already ceased its unlawful actions, civil penalties cannot provide redressability to plaintiffs' injuries.  Id. at 187-88.

Evidence that defendant's violations were ongoing at the time plaintiffs filed suit is not only relevant to the redressability element of Article III standing, but it is a necessary element of *statutory* standing under the citizen suit provision of the Clean Water Act.  33 U.S.C. § 1365(a); Gwaltney, 484 U.S. at 64; Laidlaw, 528 U.S. at 175 ("[C]itizens lack statutory standing under [the Clean Water Act] to sue for violations that have ceased by the time the complaint is filed.").  Defendant argues plaintiffs have not established that zinc effluent and solids discharge violations were ongoing at the time plaintiffs filed suit.

Establishing an ongoing permit violation for the purpose of Article III standing at the

36

summary judgment stage is at least as difficult as making the "good-faith allegation of continuous or intermittent violation" necessary to satisfy § 1365(a) standing, Gwaltney, 484 U.S. at 64, so the two analyses may be combined.  Laidlaw, 528 U.S. at 187 (applying Gwaltney statutory standard to Article III standing analysis); Mississippi River Revival, Inc. v. City of Minneapolis, 319 F.3d 1013, 1016 (8th Cir. 2003) (same).

Plaintiffs may establish that violations are ongoing by proving that defendant's violations continued on or after the date the complaint was filed or by providing "evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations."  Gwaltney, 484 U.S. at 57; see also Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 890 F.2d 690, 693 (4th Cir. 1989) (Gwaltney III).  Remedial actions taken by defendants before April 2009 are relevant in deciding whether defendant's violations were ongoing when plaintiffs filed this lawsuit. Gwaltney III, 890 F.2d at 693.  However, standing "depends on the state of things at the time of the action brought."  Gwaltney, 484 U.S. at 69 (Scalia, J. concurring).  Subsequent events that may be relevant to a mootness analysis, such as the installation of defendant's wastewater reuse system in May 2009, are irrelevant to the redressability analysis.

Redressability must be satisfied for each of defendant's six alleged violations of its permit.  Laidlaw, 528 U.S. at 185-86.  These are:  (1) the zinc effluent limits in § 1.2 of defendant's permit; (2) the total suspended solids effluent limits in § 1.2 of its permit; (3)

37

the whole effluent toxicity retest requirements in § 1.2.1.9 of its permit; (4) the sampling requirements for pH, dissolved oxygen, total suspended solids and whole effluent toxicity in § 1.2.1 of its permit; (5) the additives limits for sulfuric acid, RO-503, CWT-503 and chlorine incorporated by § 2.3.6 of its permit; and (6) the prohibition on floating solids in § 2.3.3 of its permit.  I have already concluded that claimed violations (3), (4) and the sulfuric acid aspect of violation (5) are not ripe for judicial review because of the pending administrative review proceeding.  Plaintiffs must show that defendant's conduct as it relates to each of plaintiff's remaining claims was ongoing at the time they filed this lawsuit on April 9, 2009.

Defendant does not deny that it was engaged in the allegedly unlawful conduct related to claims (2) and (5) at the time plaintiffs filed suit.  As to claim (2), defendant's discharge monitoring report shows that defendant's total suspended solids level exceeded its permit limit on May 14 and 18, 2009.  As to claim (5), it is undisputed that in April and May 2009, defendant was using additive dosages higher than the dosages contained in its permit.  Because the undisputed facts show that defendant's violations of its permit were ongoing in April 2009, plaintiffs have satisfied the redressability part of standing.  Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc., 2 F.3d 493, 502 (3d Cir. 1993) (proof of one or more post-complaint violations proves ongoing violation).  Plaintiffs have satisfied all three standing requirements for claims (2) and (5).

38

As to claim (6), plaintiffs have adduced evidence that defendant discharged floating solids in other than trace amounts in September 2008 and January 2009.  Plaintiffs argue that defendant's discharge of floating solids was an intermittent violation likely to recur. Gwaltney III, 890 F.2d at 693 (plaintiff proves ongoing violation by adducing evidence that intermittent or sporadic violations are likely to occur).  In determining whether this is so, it is necessary to consider any evidence showing that defendant had taken remedial measures at the time plaintiffs filed suit that would completely eradicate the risk of a floating solids violation.  Id.

Plaintiffs argue that because there is no evidence that defendant had implemented pollution control measures to eradicate the source of excess solids in April 2009, it is reasonably likely that defendant's intermittent discharge of floating solids will recur.  I agree. Although there is no evidence that defendant discharged floating solids after January 2009, defendant has presented no evidence that it took remedial measures to eliminate the floating solids violations before plaintiffs filed suit.  Gwaltney, 484 U.S. at 69 (Scalia, J., concurring) ("When a company has violated an effluent standard or limitation, it remains . . . 'in violation' of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation."); Texaco Refining, 2 F.3d at 502 n.5 ("A real likelihood of repetition remains so long as a discharger has failed to take remedial measures that clearly eliminate the causes of the violations"); Gwaltney III, 890 at 693-94

39

(finding ongoing violation despite lack of any violations in the month before plaintiffs filled suit).  Because defendant has not pointed to any specific remedial measures it took *before* April 2009 to address its floating solids violations, I conclude that plaintiffs have shown that defendant's discharge of floating solids was ongoing.  Plaintiffs have satisfied the redressability standard for this claim.

However, it remains genuinely disputed whether defendant was violating the zinc limitations in its permit at the time plaintiffs filed suit (claim (1)).  Plaintiffs have shown that between July 15, 2008 and January 6, 2009, defendant exceeded the weekly effluent limits for zinc contained in § 1.2.1 of its permit on ten occasions and exceeded the daily effluent limits on six occasions.  Plaintiffs contend that when they filed suit in April 2009, it was likely that defendant's violations would recur on a continuous basis in the future because of defendant's history of consistent violations and failure to remedy the problem in the past.  However, in January 2009, defendant took remedial steps to fix its zinc problem by emptying and cleaning its cooling tower, adjusting the pH of the water and monitoring the zinc corrosion rate in the tower.  Although plaintiffs argue that these remedial actions were unlikely to permanently cure the zinc problem because similar measures had failed in the past, defendant did not exceed its zinc limitations in February, March or April 2009.  Thus, it is disputed whether the remedial measures defendant took in January were likely to cure its zinc problems permanently.

40

In sum, I conclude that plaintiffs are entitled to judgment as a matter of law on the issue of standing with respect to their claims that defendant violated its total suspended solids, additives dosage limitations and floating solids limitations.  They have not shown as a matter of law that defendant's violation of its zinc effluent limitations are ongoing and that their injuries related to this violation can be redressed by injunctive relief or monetary penalties. Therefore, I will deny judgment as a matter of law on the issue of standing for plaintiffs' claims that defendant was violating its zinc effluent limits.

3.  Wisconsin Pollutant Discharge Elimination System permit violations

The claims that remain are defendant's alleged violation of (2) the total suspended solids effluent limits in § 1.2 of defendant's permit; (5) the additives limits, except sulfuric acid, incorporated by § 2.3.6 of its permit; and (6) the prohibition on floating solids in § 2.3.3 of its permit.

To succeed on the merits of a citizen suit under the Clean Water Act, plaintiffs must show that defendant violated its wastewater discharge permit or the Act itself.  33 U.S.C. § 1365(a)(1).  Also, plaintiff must prove as an element of their case-in-chief that the violations were ongoing on April 9, 2009.  Gwaltney, 484 U.S. at 66; Stroh, 116 F.3d at 821; Carr v. Alta Verde Industries, Inc., 931 F.2d 1055, 1061 (5th Cir. 1991).  Because I concluded earlier in this opinion that defendant's conduct was continuous or intermittent for the

41

purposes of Article III standing, I will not repeat that analysis here.

a.  Total suspended solids limitations, § 1.2

Defendant's discharge monitoring reports show that between September 5, 2008 and May 28, 2009, defendant exceeded its daily effluent limit for total suspended solids seven times (September 5, 2008, September 23, 2008, October 7, 2008, January 6, 2009, January 27, 2009, May 14, 2009 and May 18, 2009).  Discharge monitoring reports are conclusive evidence of a violation, Stroh Die, 116 F.3d at 818; Murphy Oil, 413 F. Supp. 2d at 1111, and defendant does not dispute the accuracy of the reports.  Therefore, plaintiffs' motion for summary judgment on this claim will be granted.

b.  Water treatment additives, § 2.3.6

Between April 2008 and May 2009, defendant used RO-503, CWT-503 and chlorine at higher dosage rates than had been approved in its permit application.  Also, in April 2009, defendant used the additive sodium bisulfite, which was not included in its permit application and thus not approved by the Wisconsin Department of Natural Resources.

Defendant argues that the email sent by James Schmidt on September 17, 2008 gave it permission to increase dosage rates for all of the water treatment additives.  As previously explained, I am not persuaded that this email qualified as written approval from the

42

department.  Schmidt merely expressed his opinion that "it doesn't appear there will be any water quality concerns with [CWT-530 and RO-503]."  Although defendant argues that the email creates at least a factual issue for the jury, "inferences supported by speculation or conjecture do not suffice to create a triable issue."  Petts v. Rockledge Furniture LLC, 534 F.3d 715, 720 (7th Cir. 2008).  The email does not say that it authorizes defendant to increase the dosage of several water treatment additives and it does otherwise qualify as a letter of authorization.  It does not even mention dosage rates for chlorine or sodium bisulfite.  Thus, I conclude that defendant violated the terms of § 2.3.6 of its permit by not obtaining a written authorization letter from the Wisconsin Department of Natural Resources before it increased usage of RO-503, chlorine and CWT-530.  In addition, it violated § 2.3.6 of its permit by using sodium bisulfite without receiving written authorization by the Department.  Plaintiffs' motion for summary judgment will be granted on plaintiffs' claim that defendant violated § 2.3.6 of its permit by using unauthorized dosages of the additives RO-503, chlorine, CWT-530 and sodium bisulfite without written permission from the Department.

c.  Floating solids, § 2.3.3

On September 12, 2008 and January 27, 2009, an environmental consultant working for plaintiffs observed floating solids discharging from defendant's pipe into the unnamed

tributary of Duck Creek.  Defendant has neither denied that this occurred or presented any evidence that would allow a reasonable jury to conclude that the discharge did not violate § 2.3.3 of defendant's permit.  Therefore, plaintiffs' motion for summary judgment on this claim will be granted.


ORDER

IT IS ORDERED that:

1.  Defendant Didion Ethanol's motion to amend its answer, dkt. #30, is DENIED.

2.  The motion for partial summary judgment filed by plaintiffs John Domino, Margo Domino, Roger Springman, Leonore Neumann, Veronica Neumann-Thompson, Nicholas Thompson and Yvonne Nehring, dkt. #12, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to the following claims:

(a) Between September 5, 2008 and May 18, 2009, Defendant violated § 1.2.1 of its permit by exceeding the daily maximum effluent limitations for total suspended solids on seven occasions;

(b) Between April 2008 and May 2009, defendant violated § 2.3.6 of its permit by using dosages of CWT-530 (twelve occasions),  RO-503 (six occasions), chlorine (four occasions) and sodium bisulfite (one occasion) at rates higher than authorized; and

(c) On September 12, 2008 and January 27, 2009, defendant violated the prohibition

44

on floating solids in § 2.3.3 of its permit.

Plaintiffs' motion is DENIED with respect to the following issues and claims:

(a) Plaintiffs have constitutional standing to assert claims that (1) defendant violated the zinc effluent limits in § 1.2 of its permit; (2) defendant violated the sampling requirements for pH, dissolved oxygen, total suspended solids and whole effluent toxicity in § 1.2.1 of its permit; (3) defendant violated the whole effluent toxicity retest requirements in § 1.2.1.9 of its permit;

(b) Defendant violated the zinc effluent limits in § 1.2 of its permit;

(c) Defendant violated the whole effluent toxicity retest requirements in § 1.2.1.9 of its permit;

(d) Defendant violated the sampling requirements for pH, dissolved oxygen, total suspended solids and whole effluent toxicity in § 1.2.1 of its permit; and

(e) Defendant violated the terms and conditions related to the use of sulfuric acid incorporated by § 2.3.6 of its permit.

Entered this 23rd day of November, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

45